UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

ELIZABETH BURGIN, et al.                                              Plaintiffs

v.                                                    Civil Action No. 3:20-cv-111-RGJ

ETHICON INC., et al.                                                 Defendants

* * * * *

**MEMORANDUM OPINION & ORDER**

Defendants Ethicon, Inc. and Johnson & Johnson (collectively "Defendants") move for partial summary judgment [DE 65-1] on all but Counts III, VII, and XVI of the eighteen count First Amended Short Form Complaint [DE 31-1]. Plaintiffs Elizabeth Burgin ("Elizabeth") and Lewis Burgin (collectively "Plaintiffs") responded [DE 81] and Defendants replied [DE 84]. Defendants also moved to exclude experts Alan Garely, M.D. ("Garely") [DE 66], Dr. Jimmy W. Mays, Ph.D. ("Mays") [DE 67], Carol Graham, M.D., M.B.A. ("Graham") [DE 68], and Paul J. Michaels, M.D. ("Michaels") [DE 69]. Plaintiffs responded to Defendants' motions to exclude [DE 78; DE 79; DE 80; DE 82] and Defendants replied [DE 85; DE 86; DE 87; DE 88]. Finally, the parties jointly moved for a status conference. [DE 100].

Briefing is complete, and the matter is ripe. For the reasons below, the Court **GRANTS** Defendants' Motion for Partial Summary Judgment [DE 65-1], **GRANTS IN PART and DENIES IN PART** Defendants' Motion to Exclude Garely [DE 66], **GRANTS IN PART and DENIES IN PART** Defendants' Motion to Exclude Mays [DE 67], **GRANTS IN PART and DENIES IN PART** Defendants' Motion to Exclude Graham [DE 68] [DE 68-1], **GRANTS IN PART and DENIES IN PART** Defendants' Motion to Exclude Michaels [DE 69], and **DENIES** the Parties' Joint Motion for Status Conference [DE 100].

1

## I.     BACKGROUND

Defendants are New Jersey Corporations that market and distribute products in the Commonwealth of Kentucky.  [*Id.* at 19–21].  Defendants released their Gynecare Prolift ("Prolift") product in 2005.  [DE 81 at 4048].  They marketed and sold Prolift kits for alleviating pelvic organ prolapse without FDA 510(k) clearance.  [DE 81 at 4048].  In 2011, the FDA concluded that the Prolift had not proven to be safe or effective.  [*Id.*].  Defendants subsequently withdrew this product from the market.  [*Id.*].

Plaintiffs are residents of Kentucky.  [DE 1-1 at 19].  On May 10, 2007, Elizabeth saw her gynecologist, Anita Kotheimer, M.D. ("Kotheimer"), for a pelvic exam.  [*Id.* at 4050].  The exam revealed a complete prolapse and an anterior defect of the vaginal wall.  [*Id.*].  Before the surgery, Kotheimer provided Elizabeth with a brochure published by Defendants with information about Prolift.  [*Id.* at 4064].  Three pages of the 16-page brochure describe the risks associated with Prolift.  [*Id.*].  The brochure describes the risks as "rare" and warns only of transient leg pain.  [*Id.*].  Kotheimer also used the brochure to inform herself about the risks of Prolift.  [*Id.* at 4064–65].  The brochure and the product insert have identical "Adverse Reactions" sections, which both omit "dyspareunia, recurrent pelvic organ prolapse, chronic vaginal and/or pelvic pain, distortion of vaginal anatomy, migration/displacement of the vaginal mesh and potential revision and explantation."  [*Id.* at 4065].

Kotheimer testified that she discussed problems with Prolift and used the brochure to explain the risks to Elizabeth.  [*Id.* (citing DE 81-1 at 4222, 4234)].  Kotheimer only discussed the risks of surgery but not the risks of products because there was no higher product information at that time.  [*Id.* (quoting DE 81-1 at 4256)].  In turn, Elizabeth testified that she relied only on

2

Kotheimer's recommendation in deciding to undergo surgery for the Prolift implant. [DE 65-6 at 985 ("Q. You decided to have the surgery to implant the Prolift on the recommendation of Dr. Kotheimer? A. Kotheimer, yes. Q. Kotheimer. Was there any other reason other than Dr. Kotheimer's recommendation that you decided to have the surgery? A. No."). Elizabeth consulted no other physicians, [*Id.*], and performed no additional research on Prolift [*Id.* at 971].

In June 2007, after consulting Kotheimer, Elizabeth underwent surgery to receive a Prolift implant to alleviate her pelvic organ prolapse. [*Id.* at 4050]. Plaintiffs paid Baptist Healthcare Systems ("Baptist") $1,786.67 for the Prolift kit. [DE 81-1 at 4315].

In July 2012, Elizabeth visited Graham, a physician and surgeon specializing in female pelvic medicine, reconstructive surgery, and obstetrics and gynecology, due to a reoccurrence of pelvic organ prolapse. [DE 81 at 4050]. Graham conducted an examination and explained to Elizabeth that "abnormal positioning of the graft had caused distortion of the anterior wall and had . . . most likely contributed to recurrent pelvic organ prolapse." [*Id.* (quoting DE 81-1 at 4173)]. Graham recommended removing part of the Prolift mesh but explained that removing the entirety of the mesh would be too risky. [*Id.* at 4051]. Elizabeth understood that the remaining Prolift mesh may cause additional problems. [*Id.*].

On September 27, 2012, Graham removed a portion of the Prolift mesh. [DE 65-1 at 822; DE 81 at 4051]. Graham performed a second procedure on April 18, 2018, to implant a new mesh to help correct the prolapse. [DE 65-1 at 822; DE 81 at 4051]. This product was not produced by Defendants. [DE 65-1 at 822]. Elizabeth had another prolapse and surgery on November 19, 2013, but no mesh was used in this procedure. [*Id.*]. Elizabeth has described several physical limitations after receiving the Prolift mesh. [DE 81 at 4052]. Among other things, Elizabeth has

difficulty cleaning, lifting her grandchildren and other heavy objects, walking, hiking, going to dinner or the theater, and traveling.  [*Id.*].

Plaintiffs filed suit on June 14, 2013.  [DE 1].  After removal to the pelvic mesh MDL, Plaintiffs filed an Amended Short Form Complaint on December 9, 2013.  [DE 11].  The Short Form Complaint alleges Negligence (Count I); Manufacturing Defect (Count II); Failure to Warn (Count III); "Defective Product" (Count IV); Design Defect (Count V); Fraud (Count VI); Fraudulent Concealment (Count VII); Constructive Fraud (Count VIII); Negligent Misrepresentation (Count IX); Negligent Infliction of Emotional Distress (Count X); Breach of Express Warranty (Count XI); Breach of Implied Warranty (Count XII); Violation of the Kentucky Consumer Protection Act (Count XIII); Gross Negligence (Count XIV); Unjust Enrichment (Count XV); Loss of Consortium (Count XVI); Punitive Damages (Count XVII), and Discovery Rule and Tolling (Count XVIII).  [*Id.* at 175–76].

Defendants moved for partial summary judgment on all but Counts III, VII, and XVI.  [DE 65-1].  In response to Defendants' motion, Plaintiffs voluntarily withdrew Counts II, IV, X, XI, XII, XIII, XVII, and XVIII.  Therefore, the Court will not consider these claims.  To support the remaining claims, Plaintiffs disclosed experts Garely [DE 66-1], Mays [DE 67-1], Graham [DE 68-1], and Michaels [DE 69-1].  Because the expert reports were cited in response to Defendants' Motion for Partial Summary Judgment, the Court must first resolve Defendants motions to exclude these experts.

## II.    MOTIONS TO EXCLUDE

Defendants moved to exclude experts Garely [DE 66], Mays [DE 67], Graham [DE 68], and Michaels [DE 69] on several grounds.  Plaintiffs responded and requested hearings on the motions to exclude.  [DE 78; DE 79; DE 80; DE 82].  The Court finds that a hearing on these

motions is unnecessary and will resolve them on the briefs.  *Himes v. United States*, 645 F.3d 771, 784 (6th Cir. 2011) (whether to hold a hearing on defendant's motion to dismiss prior to granting summary judgment against plaintiffs was not abuse of discretion; rule governing summary judgment did not require oral hearing on a motion for summary judgment).

### A.  Standard

The admissibility of expert testimony is set forth in Rule 702 of the Federal Rules of Evidence.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> (b) the testimony is based on sufficient facts or data;
>> (c) the testimony is the product of reliable principles and methods; and
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharm., Inc.*, "the Supreme Court established a general gatekeeping obligation for trial courts to exclude from trial expert testimony that is unreliable and irrelevant."  *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir.2002) (alteration and internal quotation marks omitted).

> Under Rule 702 of the Federal Rules of Evidence, 'a proposed expert's opinion is admissible . . . if the opinion satisfies three requirements.  First, the witness must be qualified by knowledge, skill, experience, training, or education.  Second, the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue.  Third, the testimony must be reliable.

*Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008)).

The Court does "not consider 'the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.'"  *Id.* (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)).  The Court must determine whether

the witness is qualified to offer an opinion on the specific area of expertise.  *In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000, 2005 WL 1868046, at *33 (N.D. Ohio Aug. 8, 2005) ("An expert may be highly qualified to respond to certain questions and to offer certain opinions, but insufficiently qualified to respond to other, related questions, or to opine about other areas of knowledge.").   "Under the Federal Rules of Evidence, the only thing a court should be concerned with in determining the qualifications of an expert is whether the expert's knowledge of the subject matter is such that his opinion will likely assist the trier of fact in arriving at the truth.  The weight of the expert's testimony must be for the trier of fact." *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981).

Along with qualifications, "[t]he Court must determine whether evidence proffered under Rule 702 'both rests on a reliable foundation and is relevant to the task at hand.'"  *Powell v. Tosh*, 942 F. Supp. 2d 678, 686 (W.D. Ky. 2013) (quoting *Daubert*, 509 U.S. at 597). To assist with this determination, the Supreme Court in *Daubert* laid out factors[1] for the courts to consider.  *Daubert*, 509 U.S. at 592–94. Courts have "stressed, however, that *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. . . . [i]n some cases . . . the factors may be pertinent, while in other cases the relevant reliability concerns may focus upon personal knowledge or experience."  *First Tenn. Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (finding that the *Daubert* factors "unhelpful" in a case involving "expert testimony derived largely from [expert's] own practical experiences throughout forty years in the banking industry [because] [o]pinions formed in such a manner do not easily lend themselves to scholarly review

---

[1] The *Daubert* factors include "[w]hether a 'theory or technique . . . can be (and has been) tested'; [w]hether it 'has been subjected to peer review and publication'; [w]hether, in respect to a particular technique, there is a high 'known or potential rate of error' and whether there are 'standards controlling the technique's operation'; and [w]hether the theory or technique enjoys 'general acceptance' within a 'relevant scientific community.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149–50 (1999) (quoting *Daubert*, 509 U.S. at 592–94).

or to traditional scientific evaluation") (internal citations omitted).  "[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."  *Kumho Tire Co.*, 526 U.S. at 139.

**B.  Defendants' Motion and Memorandum to Exclude Certain Opinions of Alan Garely, M.D. [DE 66]**

Garely was disclosed as Plaintiffs' general urogynecological expert.  Defendants move to exclude Garely's opinions regarding (1) Defendants' knowledge, state of mind, and alleged bad acts, (2) inadequate product warnings, (3) historical commentary, (4) FDA regulatory process and requirements, (5) biomaterials or medical device design, and (6) safer alternative designs.  [DE 66 at 1005].  Plaintiffs largely refute Defendants arguments.  [DE 80].

*1.   Opinions Regarding Defendants' Knowledge, State of Mind, and Alleged Bad Acts*

Defendants argue that Garely should be precluded from offering opinions about Ethicon's knowledge or state of mind.  [DE 66 at 1005].  They provide the following examples of Garely's testimony:

> In its IFU as well as its training and marketing materials, Ethicon made misleading representations to physicians that were contrary to its own internal documents which showed information known to or, at a minimum, available to Ethicon.

> In its Patient Information Brochure for the Prolift kits, Ethicon claimed that '[Prolift] allows for the restoration of sexual function by restoring vaginal anatomy,' a claim which is contrary to data from its own studies and to information from a number of sources, including one of the company's own medical directors.

> The IFU statement that '[t]he bi-directional elastic property [of the mesh] allows adaptation to various stresses encountered in the body,' is also misleading. Ethicon never conducted testing nor studies to determine the 'various stresses encountered in the [female pelvis],' so there is no factual basis for any such statement. Also . . . Ethicon's internal documents demonstrate that the mesh was too strong, was 'over-engineered,' and was too stiff and inflexible for use in the female pelvis.

> Despite being supplied this information by the director of the study, who also happened to be one of the inventors of the Prolift kits, Ethicon never provided any

> such warning or information to doctors nor indicated in the labeling any limitation
> on the use of the Prolift kits relative to the grade or severity of prolapse.

[*Id.* at 1005–1006 (internal citations omitted)].   In response to Defendants' arguments, Plaintiffs contend that these opinions, and others cited in their response, do not pertain to Defendants' state of mind.  [DE 80 at 3916–17].  They also argue that their claims for punitive damages allow them to present evidence on Defendants' state of mind.  [*Id.* at 3917].

The MDL Court precluded Garely from speculating about Defendants' state of mind or legal conclusions.  *See In re Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, No. 2327, 2016 WL 4582209, at *5 (S.D. W. Va. Sept. 1, 2016).  The MDL Court similarly excluded testimony from other experts who attempted to testify about Defendants' knowledge or state of mind.  *See In re Ethicon, Inc., Pelvic Repair Sys. Prod. Liab. Litig.*, No. 2:12-CV-4301, 2014 WL 186872, at *6 (S.D. W. Va. Jan. 15, 2014) ("Ethicon's knowledge, state of mind, or other matters related to corporate conduct and ethics are not appropriate subjects of expert testimony because opinions on these matters will not assist the jury."); *see also In re C. R. Bard, Inc., Pelvic Repair Sys. Prod. Liab. Litig.*, No. MDL 2187, 2018 WL 4212409, at *3 (S.D. W. Va. Sept. 4, 2018) (excluding Garely's expert opinions related to a corporation's knowledge, state of mind, and corporate conduct).  Simply put, "[i]nferences about the intent and motive of parties or others lie outside the bounds of expert testimony." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004).

Garely's opinions go to Defendants' knowledge and alleged recklessness.  Courts have found that similar statements from Garely constituted testimony on a defendant's state of mind. *See, e.g.*, *In re C. R. Bard, Inc., Pelvic Repair Sys. Prod. Liab. Litig.*, 2018 WL 4212409, at *3.  In *Bard*, Garely concluded that the defendant recognized the risks associated with its pelvic mesh

products and the complications that could follow.  *See id.*  Because Garely had also testified about the defendant's knowledge and motive for its actions, the court excluded Garely's testimony.  *Id.*

Plaintiffs assert that Garely's testimony is admissible here because Kentucky law requires evidence of recklessness to succeed on a claim for punitive damages.  [DE 80 at 3917].  However, Rule 702 limits expert testimony to opinions based on the "expert's scientific, technical, or other specialized knowledge."  Plaintiffs have cited no case law indicating that this would change by asserting a claim for punitive damages.  [DE 80].  To the extent Plaintiffs claim Garely is testifying about information in corporate documents, this argument has also been rejected.  *See In re Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2016 WL 4582209, at *5.  Garely may only testify about his review of internal corporate documents to explain the basis for his opinions.  *See id.*  He is prohibited from acting as "a conduit for corporate information."  *Id.*  To the extent this information is admissible, it cannot be admitted through Garely under Rule 702.

## 2. *Opinions Regarding Product Warnings*

Defendants argue that Garely should be precluded from offering opinions regarding what should or should not have been included in the Prolift product warnings.  [DE 66 at 1007].  They provide 14 examples of opinions that Defendants argue constitute testimony on product warnings.  [*Id.* at 1008–1010].  Plaintiffs concede that they will not have Garely testify regarding the development or adequacy of Prolift's labeling.  [DE 80 at 3920].  However, Plaintiffs contend that all but the sixth and tenth bullet points in Defendants' motion are admissible because they are not statements about the adequacy of labeling.  [DE 80 at 3920].

The MDL Court addressed whether Garely may testify about warning labels:

> Dr. Garely is not an expert in the development of warning labels. While an expert who is an obstetrician and gynecologist may testify about the specific risks of implanting mesh and whether those risks appeared on the relevant [Instruction for Use ("IFU")], the same expert must possess additional expertise to offer expert testimony about what information should or should not be included in an IFU. Dr. Garely does not possess the additional expertise to offer expert testimony about what an IFU should or should not include.

*See In re Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2016 WL 4582209, at *5 (citations omitted). The Court finds no reason to disturb this ruling. That said, orders excluding "broad categories of evidence should rarely be employed. A better practice is to deal with questions of admissibility of evidence as they arise." *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975).

The Court is unable to rule on all 12 examples of testimony that remain in dispute. To the extent Garely attempts to testify about what should or should not have been included on the warning labels, Garely's testimony will be excluded. Two examples of this prohibited testimony include the twelfth and fourteenth bullet points. [DE 66 at 1009–1010]. Garely testified that "Ethicon failed to adequately warn that the use of trocars inserted blindly through and into muscle and other tissue created the risks of tissue injury and potentially permanent nerve damage and pain."[2] [DE 66-1 at 1056]. He also testified that "Ethicon failed to warn about this risk, and failed to provide any instruction or direction as to how to address complications, or what to do in the event mesh removal was necessary." [*Id.*]. The Court finds that these examples cross the line into opining on what should have been included in the warning label. Therefore, Garely will be excluded from testifying about these opinions and any others where Garely testifies about what should have been in the warning label. *See In re Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*,

---

[2] Defendants also argue that this statement constitutes a legal conclusion. [DE 66 at 1009 n.3]. Federal Rule of Evidence 702 "prohibits expert witnesses from testifying to legal conclusions." *United States v. Melcher*, 672 F. App'x 547, 552 (6th Cir. 2016). The Court will also exclude this opinion to the extent it was presented as a legal conclusion. *See id.*

2016 WL 4582209, at *5.  To prevent excluding a broad category of evidence without further context, the Court will reserve its ruling on the remaining bullet points.  *See Sperberg*, 519 F.2d at 712.

Defendants also move to exclude certain statements that based on their accuracy and support.  [DE 66 at 1012].  As Plaintiffs explain, the MDL Court rejected these arguments and summed them up to little more than a disagreement between the parties.  *See In re Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2016 WL 4582209, at *5.  The Court agrees with the MDL Court's ruling.  To the extent Defendants dispute the support for Garely's testimony, such arguments would affect the credibility and weight of his opinions.  *See Warren v. Prison Health Servs., Inc.*, 576 F. App'x 545, 560 (6th Cir. 2014) (holding that evaluating the weight of the evidence is beyond the purview of the court).  Therefore, the Court will not exclude Garely's opinions based on their accuracy or support.

### 3.  Opinions Considered Historical Commentary

Defendants move to exclude five of Garely's opinions arguing that they argue are merely historical commentary.  [DE 66 at 1014–15].  In response, Plaintiffs contend that the statements include information regarding Defendants' knowledge and Prolift design defects.  [DE 80 at 3923].

The MDL Court cautioned against introducing corporate evidence through experts.  *See In re Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2016 WL 4582209, at *5.  "An expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based on the record of evidence."  *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009).

Plaintiffs' counterarguments must fail.  The Court has held, *supra* Section II.B.1., that Garely's testimony about Defendants' knowledge will be excluded.  Moreover, for the reasons addressed below, the Court dismissed Plaintiffs' design defect claims.  *See infra* Section III.C. Because the design defect claims were dismissed, Garely's testimony related to design defects is

irrelevant and inadmissible. *See* Fed. R. Evid. 401. ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."). Therefore, the Court must exclude Garely's opinions cited by Defendants. [DE 66 at 1014–15].

### 4.   *Opinions About Regulatory Processes and Requirements*

Defendants moved to exclude Garely's opinions about regulatory processes and requirements. [DE 66 at 1015]. Plaintiffs submit that Garely will not offer any opinions on these topics. [DE 80 at 3924]. Accordingly, Garely's testimony on regulatory processes and requirements will be excluded.

### 5.   *Opinions Regarding Biomaterial Properties of Mesh, Nerve Entrapment, Degradation, and Design of Medical Devices*

Defendants move to exclude Garely's opinions on "biomaterials, polypropylene degradation, entrapment of tiny nerves in mesh pores, chronic foreign body reaction, adequate pore size, adequate weight of polypropylene, and biocompatibility of polypropylene." [DE 66 at 1016]. They argue that these opinions touch the subject of biomaterials science, which Garely is not qualified to testify about. [*Id.*]. They also argue that his opinions are unreliable because they fail to cite peer-reviewed medical literature. [*Id.* at 1020]. In response, Plaintiffs submit that Garely will not testify about degradation. [DE 80 at 3925]. But they argue that Garely is qualified to offer opinions on biomaterials, nerve entrapment, foreign body reactions, pore size, design, weight, and biocompatibility. [*Id.*]. They also contend that Garely's opinions are reliable. [*Id.*].

The MDL Court directly addressed these issues. As for Garely's qualifications, the MDL Court held that qualifications as a biomaterials engineer, a polymer scientist, or a pathologist are not "necessary to opine on mesh from a clinical perspective, which is what Dr. Garely purports to do." *In re Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2016 WL 4582209, at *3. The court

12

held that as "a board-certified urogynecologist with experience performing thousands of pelvic

repair surgeries using synthetic mesh devices," Garely was qualified to "opine on mesh's reaction

to and effect on the human body." *Id.*

      Ethicon had also challenged the reliability of Garely's opinions before the MDL Court

because he failed to cite peer-reviewed medical literature. *See id.* at *4. The MDL Court held:

> Ethicon basically argues that Dr. Garely's reliance on personal experience and
> internal company documents is insufficient standing alone. But such sources may,
> theoretically, provide a reasonable basis for expert testimony. *See, e.g.*, *Kumho*, 526
> U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of
> observations based on extensive and specialized experience."). Because Ethicon
> does not advance any additional arguments as to the reliability of Dr. Garely's
> testimony, its Motion is **DENIED** on this point.

*Id.*

      The Court notes that Defendants make exactly the same arguments rejected by the MDL

Court. *Compare* [DE 66 at 1018–21] *with In re Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*,

2016 WL 4582209, at *3–4. To refute this holding, Defendants simply argue that the MDL Court's

holding was incorrect. [DE 66 at 1018 ("Respectfully, the MDL Court's ruling is erroneous, and

this Court should exclude these opinions as beyond Dr. Garely's expertise."). Because Defendants

cited no controlling case law to the contrary, the Court will not disturb the MDL Court's ruling.

Nevertheless, the Court will address Garely's qualifications and the reliability of his testimony.

      The Court will first address Garely's qualifications. The Court finds that Garely has

extensive experience with pelvic mesh in a clinical setting. Garely has experience with pelvic

mesh and pelvic mesh repair surgery dating to 1998. [DE 66-1 at 1033]. He has personally

diagnosed and treated more than 100 patients with mesh complications and authored several peer-

reviewed publications. [*Id.* at 1029–34]. He also reviewed internal corporate documents, [*id.* at

1037–40], and photographs of material under a microscope [*id.* at 1041]. The Court finds that

Garely is qualified to offer an opinion on this area of expertise based on his clinical experience and document review. *See In re Welding Fume Prods. Liab. Litig.*, 2005 WL 1868046, at *33. The Court also finds that Garely's testimony could assist the trier of fact. *See Mannino*, 650 F.2d at 851.

Next, the Court will address Garely's reliability on these topics. Defendants object to the fact that Garely relied on personal experience rather than peer-reviewed medical literature. [DE 66 at 1020]. The Court has broad discretion to determine reliability. *See Kumho Tire Co.*, 526 U.S. at 139. Whether an opinion is subject to peer-reviewed literature is only one of several factors that the Court may consider when evaluating reliability. *See id.* at 149–50. The Court may, as it does here, find expert testimony reliable when it is based on decades of experience. *See First Tenn. Bank Nat. Ass'n*, 268 F.3d at 335. As discussed, Garely has decades of experience working with pelvic mesh in a clinical setting. [DE 66-1 at 1033]. As a result, the Court finds that Garely's testimony is reliable. *See First Tenn. Bank Nat. Ass'n*, 268 F.3d at 335. To the extent Defendants attack the weight of Garely's testimony, this issue must be reserved for the trier of fact. *See Mannino*, 650 F.2d at 851. Accordingly, the Court will not exclude Garely's testimony on biomaterials, nerve entrapment, foreign body reactions, pore size, design, weight, and biocompatibility.

### 6. *Opinions Regarding Safer Alternative Designs*

Defendants move to exclude Garely's opinions regarding safer alternative designs because they are unreliable and irrelevant. [DE 66 at 1021]. Plaintiffs refute Defendants' arguments. [DE 80 at 3929]. Garely's opinions on safer alternative designs is relevant to Plaintiffs' design defect claims. But as explained below, *infra* Section III.C, the Court dismissed Plaintiffs' design defect claim. For the Court to admit evidence, it must be relevant to the claims alleged. *See* Fed. R. Evid. 401. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it

14

would be without the evidence; and (b) the fact is of consequence in determining the action." *Id*.

Because the Court dismissed Plaintiffs' design defect claims, testimony about alternative designs

would be irrelevant. *See id.* Therefore, the Court will exclude Garely's testimony on alternative

designs.

Based on the discussion above, Defendants' Motion to Exclude Garely [DE 66] is

**GRANTED IN PART and DENIED IN PART** consistent with the Court's holdings.

### C. Defendants' Motion to Exclude the Opinions and Testimony of D. Jimmy W. Mays and Incorporated Memorandum of Law [DE 67]

Mays was disclosed as Plaintiffs' general causation materials expert. [DE 79 at 3858].

Defendants move to exclude May's opinions about degradation and clinical complications caused

by degradation. [DE 67]. They also move to exclude Mays' opinions on Defendants' knowledge,

state of mind, corporate conduct, as well as legal conclusions veiled as expert opinions. [*Id.*].

Plaintiffs refute all but Defendants' motion to exclude Mays' opinion on clinical complications

caused by degradation. [DE 79]. Accordingly, the Court will exclude Mays' opinions on clinical

complications caused by degradation and will not address these arguments.

#### 1. *Opinions about Degradation*

Defendants argue that May's opinions on degradation are unreliable. [DE 67 at 1346].

They assert that his opinions are undermined by the differences in Prolene and polypropylene,

which is not accounted for in his report. [*Id.* at 1347]. They also assert that Mays' opinions must

be excluded because he did not test his opinions about degradation. [*Id.* at 1348]. Defendants also

contend that several scientific studies that Mays relies on are either unreliable or inapposite to his

testimony. [*Id.* at 1350]. Finally, Defendants argue that they should be allowed to introduce

evidence about FDA approval of Prolene polypropylene sutures if Mays is permitted to testify

about Defendants' internal studies. [*Id.* at 1356]. In response, Plaintiffs argue that the MDL Court

has already considered this same motion on Mays' testimony and rejected Defendants' arguments.

[DE 3860].

> The MDL Court held:
>
> Ethicon argues that Dr. Mays's degradation opinions are unreliable and should be excluded. Ethicon's argument hinges on its assertion that Prolene is unique from generic polypropylene and Dr. Mays did not base his opinions on literature specific to Prolene. I disagree that the supposed distinction between Prolene specifically and polypropylene generally renders studies on the latter unhelpful when discussing the former . . . . Insofar as Ethicon seeks exclusion of Dr. Mays's opinions because he does not account for the differences between polypropylene and Prolene, its Motion is **DENIED**.

*See In re: Ethicon, Inc.*, No. 2327, 2016 WL 4958282, at *2 (S.D. W. Va. Aug. 25, 2016). This opinion is consistent with the MDL Court's prior ruling on the differences between Prolene and polypropylene. *See, e.g.*, *Huskey v. Ethicon, Inc.*, 29 F. Supp. 3d 691, 703 (S.D. W. Va. 2014) ("This appears to be an argument wholly conceived by lawyers, unfounded in science.").

The MDL Court also denied Defendants' request to present evidence related to FDA approval of Prolene sutures if Mays is permitted to testify about Defendants' internal studies. *See id.* at *3. The court held that "FDA approval of Prolene sutures has no bearing on the degradation-specific findings of the relevant studies or on the appropriateness of Dr. Mays's reliance on them to opine on degradation." *Id.* at *3.

Defendants concede that the MDL Court has already rejected their arguments. [DE 67 at 1347]. Defendants contend that the MDL Court's ruling conflicts with the "intellectual rigor" employed by polymer chemists. [*Id.*]. Mays concedes that there is a difference between Prolene and polypropylene, [DE 67-2 at 1523], but Defendants cite no testimony or evidence that studies on polypropylene cannot inform those on Prolene, [DE 67]. Mays based his opinions on his "education, experience, research and what is accepted within the community of leading scientists practicing in the field of polymer chemistry." [DE 67-1 at 1367]. In forming his opinions, Mays

reviewed materials published in medical and scientific journals, internal company documents, deposition transcripts, and expert reports.  [*Id.* at 1367–68].  Mays' opinions are based on more than literature specific to polypropylene.  [*Id.*].   Accordingly, the Court agrees with the MDL Court and will not exclude Mays' opinion because it incorporates some studies regarding polypropylene. *See In re: Ethicon, Inc.*, 2016 WL 4958282, at *2.

Defendants also contest the reliability of Mays' opinions because he did not personally conduct tests on Prolene.  [DE 67 at 1349].  In response, Plaintiffs assert that Mays' opinions are reliable despite his failure to tests them.  [DE 79 at 3862–63].  "There is no requirement that an expert's theories must actually be tested in order to satisfy the *Daubert* inquiry." *Anderson v. Ridge Tool Co.*, No. CIV.A. 06-116-HRW, 2008 WL 3849923, at *5 (E.D. Ky. Aug. 14, 2008). The Sixth Circuit has held that a district court has the discretion to decide that an expert's failure to test their theories goes "to the weight of his testimony . . . not to its admissibility." *Clay v. Ford Motor Co.*, 215 F.3d 663, 668 (6th Cir. 2000).  And questions of weight must be reserved for the trier of fact. *See Mannino*, 650 F.2d at 851.

Defendants cite two cases in which Mays' opinions were excluded because they were unreliable based on testing.  [DE 67 at 1350 (citing *Frankum v. Bos. Sci. Corp.*, No. 2:12-CV-00904, 2015 WL 1976952 (S.D. W. Va. May 1, 2015) and *Eghnayem v. Bos. Sci. Corp.*, 57 F. Supp. 3d 658 (S.D. W. Va. 2014)].   In *Frankum*, Mays' opinion was excluded because his thermogravimetric analysis did not replicate the *in vivo* environment. *See* 2015 WL 1976952, at *15.  In *Eghnayem*, the Court excluded Mays' testimony based on specific testing completed by Mays and Dr. Gido  *See* 57 F. Supp. 3d at 685–91.  Yet neither of these points are at issue.  As a result, the Court finds that *Frankum* and *Eghnayem* are distinguishable.  Defendants have failed to demonstrate that Mays' failure to test his opinions goes to anything other than the weight of his

testimony.  *See Clay*, 215 F.3d at 668.  Accordingly, the Court will not exclude Mays' opinions based on his failure to test.

Defendants also point to several scientific studies cited in Mays' report that they argue are unreliable and based on unreliable methodology.  [DE 67 at 1350–56].  In response, Plaintiffs contend the articles referencing Prolene are only a small piece of evidence that contributed to his overall opinion on degradation of polypropylene.  [DE 79 at 3867].  The fact that not all studies assess Prolene in the female pelvic floor does not diminish their reliability or relevance.  [*Id.*].  All the articles Mays relied on were published in peer-reviewed journals and involved some form of polypropylene.  [DE 67-1].

Defendants specifically sought to undermine Mays' reliance on *Comparison of the In Vivo Behavior of Polyvinylidene Flouride and Polypropylene Sutures Used in Vascular Surgery*, 44 Am. Soc'y Artificial Intelligence Organs J. 199 (1998) ("Mary Study").  [DE 67 at 1355]. Defendants note that the authors concluded that Prolene structures had oxidized based on FTIR test results showing a peak at $1,740^{cm-}$, which identifies the presence of surface oxidation.  Mays conceded that the authors of the Mary Study did not recognize that $1,740^{cm-}$ is also the wavelength for one of the antioxidants used in Prolene.  [DE 62-2 at 1546].  But Mays explained that the authors cleaned the sample and the length of time that the sutures had been in the body would have depleted the antioxidants present on the surface.  [*Id.*].  Accordingly, the Court finds that Defendants' arguments go to the weight of Mays' testimony rather than its admissibility.  *See Clay*, 215 F.3d at 668.  The Court will not exclude Mays' testimony because he relied, at times, on the studies cited by Defendants.

Finally,  Defendants contend that the Court should prohibit Mays from testifying about their own internal studies because they are unreliable and do not support his opinions.  [DE 67 at

18

1356].  If the Court does allow Mays to testify about these documents, then Defendants contend that they should be allowed to introduce evidence of FDA approval and regulation of Prolene polypropylene sutures.  [*Id.*].  Defendants dispute whether the internal studies support Mays' opinion that the suture's degraded.  [*Id.*].  But, again, Defendants' arguments go to the weight of Mays' opinion and constitutes a subject for cross-examination.  *See Clay*, 215 F.3d at 668.  To the extent Defendants contend that they must be allowed to introduce evidence of FDA approval and regulation, the MDL Court held that this information is irrelevant to Mays' opinions on degradation.  *See In re: Ethicon, Inc.*, No. 2327, 2016 WL 4958282, at *3.  The Court also finds that evidence of FDA approval and regulation is irrelevant under Rule 401 and introducing this evidence would risk the jury attaching undue significance.  *See* Fed. R. Evid. 403.  Therefore the Court will not exclude Mays' testimony about Defendants' own internal studies, but will exclude evidence related to the FDA's approval and regulation of Prolene polypropylene sutures.

### 2. *Opinions Regarding Defendants' Knowledge, State of Mind, and Corporate Conduct and Opinions Constituting Legal Conclusions*

Defendants move to exclude Mays' opinions about Defendants' knowledge, state of mind, and corporate conduct and opinions constituting legal conclusions.  [DE 67 at 1359].  Defendants contend that these opinions exceed the scope of proper expert testimony.  [*Id.*].  In response, Plaintiffs argue that Mays does not offer opinions about Defendants' state of mind or legal conclusions.  [DE 79 at 3872].

The Court has already addressed this issue in its holding on Garely's expert testimony.  *See supra* Sections II.B.1, 3.  Citing the MDL Court's opinion, the Court held that Garely was prohibited from opining on Defendants' Ethicon's knowledge, state of mind, or other matters related to corporate conduct.  *See supra* Sections II.B.1 (citing *In re Ethicon, Inc., Pelvic Repair Sys. Prod. Liab. Litig.*, 2014 WL 186872, at *6).  The Court similarly prohibited Plaintiffs from

submitting corporate evidence through experts that amounted to historical commentary. *See supra* Section II.B.3. "An expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based on the record of evidence." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d at 192.

For the same reasons articulated in Section II.B.1, Mays' opinions about Defendants' knowledge, state of mind, and corporate conduct must be excluded. Plaintiffs' arguments based on punitive damages do not expand the scope of testimony permitted under Rule 702. Similarly, Mays is prohibited from acting as a conduit for corporate information. *See supra* Section II.B.3. Evidence considered historical commentary that would otherwise be admissible cannot be introduced through an expert. *See In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d at 192.

Defendants also move to prohibit Mays' opinions that amount to legal conclusions. [DE 67 at 1360]. Experts are prohibited from offering legal conclusions. *See Melcher*, 672 F. App'x at 552. The Sixth Circuit has held that an expert is offering a legal conclusion "when he defines the governing legal standard or applies the standard to the facts of the case." *Id.* (citing *Torres v. Cty. of Oakland*, 758 F.2d 147, 150–51 (6th Cir. 1985)). Courts have extensive, but not unlimited, discretion to admit or exclude testimony that arguably contains legal conclusions. *See Torres*, 758 F.2d at 150 (citing *Stoler v. Penn Cent. Transp. Co.*, 583 F.2d 896, 899 (6th Cir. 1978)). To determine whether a witness is articulating a legal conclusion, the Court must look at the terms used in the witness's testimony and decide whether they have a "separate, distinct and specialized meaning in the law different from that present in the vernacular." *Id.* If they do, then the Court must exclude the testimony. *Id.* (citing *United States v. Hearst,* 563 F.2d 1331, 1351 (9th Cir. 1977), *cert. denied,* 435 U.S. 1000 (1978)).

Mays makes several statements about the "reasonableness" and defective nature of Prolift throughout his opinion.  [DE 67 at 1360 (citing 67-1)].  These terms have a "separate, distinct and specialized meaning in the law."  *Torres*, 758 F.2d at 15.  Therefore, these opinions constitute impermissible legal conclusions.  *See id.*  Mays' is prohibited from testifying on these and other opinions that constitute legal conclusions.  *Melcher*, 672 F. App'x at 55.

Based on the discussion above, Defendants' Motion to Exclude Mays [DE 67] is **GRANTED IN PART and DENIED IN PART** consistent with the Court's holdings.

### D.  Defendants' Motion and Memorandum to Exclude the Case-Specific Opinions of Carol Graham, M.D., M.B.A. [DE 68]

Plaintiffs disclosed Graham on February 15, 2021.  [DE 651].  Graham's expert report describes her as a case-specific expert.  [DE 68-1].  Graham details Elizabeth's medical history and issues related to Prolift.  [*Id.*].  She also explains the future economic effect of Elizabeth's injuries that are allegedly related to Prolift.  [*Id.*].  Defendants move to exclude Graham's opinions about product warnings, causation, conclusions based on a differential diagnosis, and economic damages.  [DE 68].  Plaintiffs submit that Graham will not offer opinions about the development and adequacy of labeling but refute Defendants other arguments.  [DE 78].

### 1.  *Opinions Regarding Product Warnings*

Defendants argue that Graham should be precluded from offering opinions about what should or should not have been included in the Prolift product warnings.  [DE 68 at 2145].  They provide five bullet point examples in their motion to exclude that Defendants argue constitute testimony on product warnings.  [*Id.*].  Ultimately, they contend that Graham is unqualified to opine on this topic for the same reasons the MDL Court held that Garely was also prohibited from offering these opinions.  [*Id.*].  In response,  Plaintiffs submit that Graham will not offer opinions on what should have been in the Prolift product warning.  [DE 78 at 3444].  Yet Plaintiffs contend

21

that Defendants' examples in their motion are admissible because they are not statements about the adequacy of labeling.  [DE 78 at 3446].

Consistent with the Court's ruling on Garely, *supra* Section II.B.2, Graham "may testify about the specific risks of implanting mesh and whether those risks appeared on the relevant" product warning label.  *In re Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2016 WL 4582209, at *5.  But Graham will be precluded from testifying "about what information should or should not be included in" a product warning label.  *Id.*  That said, the Court cannot rule on the five examples provided by Defendants.  Without additional context, the Court is unable to determine whether these opinions cross the line into explaining what should have been in the warning label. To prevent excluding a broad category of evidence without further context, the Court will reserve its ruling on Defendants' examples.  *See Sperberg*, 519 F.2d at 712.

### 2.  *Opinions Regarding Causation*

Defendants contend that Graham's case-specific causation opinions must be excluded because she failed to rely on the opinions of a general-causation expert disclosed in this case.  [DE 68 at 2147].  In response, Plaintiffs contend that Graham relied on opinions from Weber, a general-causation expert disclosed in the larger case before the MDL Court.  [DE 78 at 3448–49].  They also contend that Graham was disclosed as a case-specific and general-causation expert.  [*Id.* at 3449].  Graham's expert report identifies her as a "case-specific" expert.  [DE 68-1 at 2155]. Therefore, the Court will only consider Graham a case-specific expert and not a general-causation expert.  Plaintiffs have cited no case law suggesting that the Court could hold otherwise.  [DE 78].

Courts have held that an expert's "failure to offer or rely upon a general causation opinion renders [a] specific causation opinion[] without foundation and therefore inadmissible."  *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 458 (S.D.N.Y. 2016).  "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally

observed." Fed. R. Evid. 703.  The evidence used and relied on in forming an expert report "need not be admissible for the opinion to be admitted." *Id.*

Plaintiffs concede that a case-specific expert opinions must base their foundation in a general-causation opinion.  [DE 78 at 3448].  As a result, the question becomes whether Graham may base her case-specific opinions on Weber's general-opinions even though he was not disclosed as an expert in this action.  Defendants contend that allowing Graham to rely on Weber's opinions would violate their agreement to limit expert discovery to five expert witnesses.  [DE 87 at 4818].  The agreement states that "as part of their allotted five expert witnesses, Plaintiffs may designate general causation experts and testimony developed and existing in the MDL."  [DE 43 at 744].  Plaintiffs designated their five experts but did not include Weber.  [DE 61].  However, the agreement says nothing about what may be relied on in expert reports.  [DE 43].  Therefore, the Court will not read the parties' agreement so strictly as to prohibit experts from relying on others who were not disclosed in this case.

Under Rule 703, Graham may rely on anything she "has been made aware of or personally observed." Fed. R. Evid 703.  Defendants have cited no cases that would prohibit Graham from relying on Weber's opinions.  [DE 68].  Although Weber's report may not be admissible, Graham may rely on other expert material. *See* Fed. R. Evid. 703.  Accordingly, the Court will not exclude Graham's causation opinions on this basis.

### 3. Opinions Regarding Causation Based on a Differential Diagnosis

Defendants move to exclude Graham's opinions that Elizabeth's injuries were caused by Prolift because Graham's differential diagnosis is unreliable.  [DE 68 at 2149].  Defendants contend that Graham failed to properly rule out alternative causes of injury.  [*Id.*].  In response, Plaintiffs argue that a differential diagnosis is not required, and that Defendants' arguments go to the weight of Graham's testimony.  [DE 78 at 3450–51].

The Sixth Circuit has held that a differential diagnosis is "a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 678 (6th Cir. 2011) (quoting *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir.2001)).  But a differential diagnosis can be unreliable when an expert fails to adequately rule out other causes of injury.  *See id.* at 680.  The parties agree that the differential diagnosis is not the only acceptable means of proving causation.  [DE 78 at 3450; DE 87 at 4819].  Kentucky subscribes to the substantial factor test for causation, which asks whether the defendant's "conduct is a substantial factor in bring about the harm." *Gonzalez v. Johnson*, 581 S.W.3d 529, 533–34 (Ky. 2019).

Defendants sought to exclude another expert, John Steege ("Steege"), using the same argument.  *See Edwards v. Ethicon, Inc.*, No. 2:12-CV-09972, 2014 WL 3361923, at *5–6 (S.D. W. Va. July 8, 2014).  However, the MDL Court rejected Defendants' arguments after finding that Steege considered other potential causes of the plaintiff's injury.  *See id.* at *6.  Although the MDL Court found that Steege did not provide a detailed explanation as to why he ruled out alternative causes, the Court did find that he based his opinion on accepted scientific principles and research. *See id.*

The Court finds *Edwards* instructive.  Graham concluded:

> The Anterior Prolift device is the exclusive cause of Ms. Burgin's injuries as described in the above report.  Specifically, they are not due to some trauma, any pre-existing medical conditions, and age-related conditions, any degradative medical condition, the failure of another product used for implanting the mesh, Ms. Burgin's anatomy or Ms. Burgin's lifestyle or social history or the result of medical negligence by the implanting surgeon.

[DE 68-1 at 2178].  In forming this opinion, Graham discussed Elizabeth's medical history at length.  [DE 68-1 at 2159–68].  Graham also conducted numerous exams on Elizabeth both with and without anesthesia.  [*Id.*].  Although Graham does not detail why none of the alternatives

identified in her report caused Elizabeth's conditions, Graham based her conclusions on numerous exams and a thorough assessment of Elizabeth's medical records. [*Id.*]. The MDL Court has found these methods to be a reliable means of discounting alternative causes. *See, e.g.*, *Edwards*, 2014 WL 3361923, at *6 (citing *Heller v. Shaw Indus.*, 167 F.3d 146, 156 (3d Cir. 1999)). Therefore, Graham's opinions satisfy the differential diagnosis test. *Pluck v. BP Oil Pipeline Co.*, 640 F.3d at 678. The Court finds that Graham's conclusions are reliable and based on accepted scientific principles and research. *See Edwards*, 2014 WL 3361923, at *6. The Court will not exclude Graham's opinion on this basis.

#### 4.   *Opinions Regarding Economic Damages*

Defendants move to exclude Graham's opinions about Plaintiffs' economic damages. [DE 68 at 2152]. They contend that Graham is not qualified to opine on Elizabeth's loss of future income, costs of future medical care, and the cost associated with loss of consortium. [*Id.* at 2152]. In response, Plaintiffs argue that Graham is qualified and formulated these opinions based on reliable studies. [DE 78 at 3451–52].

"Kentucky law permits compensation for 'the increased likelihood of future complications' where 'substantial evidence of probative value' supports that likelihood." *Garvin v. Ethicon, Inc.*, 616 F. Supp. 3d 658, 681 (W.D. Ky. 2022) (quoting *Davis v. Graviss*, 672 S.W.2d 928, 932 (Ky. 1984)). Juries may consider expert testimony to calculate "future physical pain and . . . medical expenses." *Cap. Holding Corp. v. Bailey*, 873 S.W.2d 187, 195 (Ky. 1994). This Court has held that medical doctors are qualified to testify regarding future medical expenses under Kentucky law. *See, e.g.*, *Garvin*, 616 F. Supp. 3d at 681–82 (citing *Cincinnati Ins. Co. v. Samples*, 192 S.W.3d 311, 318 (Ky. 2006)). These opinions are still required to have a reasonable factual basis. *See United States v. L.E. Cooke Co., Inc.*, 991 F.2d 336, 342 (6th Cir. 1993).

Plaintiffs submit that Graham's opinion on damages related to loss of future income are only relevant to Elizabeth's disability determination. [DE 78 at 3452]. Therefore, the Court will limit Graham's testimony—to the extent that it is relevant—to opinions on Elizabeth's long-term disability. Next, Graham estimates Elizabeth's future medical expenses for continued care and another surgical procedure at $2,569,282. [DE 68-1 at 2167]. Graham bases this opinion on her numerous examinations, review of Elizabeth's medical records, and experience. [*Id.* at 2159–68]. The Court finds that doctors, like Graham, are permitted to opine on future medical expenses when basing their opinions on similar reliable methods. *See Garvin*, 616 F. Supp. 3d at 682 (citing *Orr v. Ethicon, Inc.*, No. 2:20-cv-110, 2020 WL 9073528, at *11 (E.D. Tenn. Sept. 11, 2020)). Accordingly, the Court will not exclude Graham's opinions on future medical expenses.

Finally, Graham opines that "[t]he cost, however, of lost intimacy between Ms. Burgin and Mr. Burgin from [sic] is immeasurable." [DE 68-1 at 2168]. Graham may testify about Elizabeth's loss of physical intimacy. *See Garvin*, 616 F. Supp. 3d at 682. Graham's opinions are relevant to Plaintiffs' claim for loss of consortium. *See* Fed. R. Evid. 401. That said, Graham does not purport to base her opinion regarding the economic valuation of Plaintiffs' loss of intimacy on anything other than observations of Plaintiffs' interactions. [DE 78 at 3452]. There is no methodology to evaluate and no indication that Graham is more qualified to evaluate the economics of loss of intimacy than the jury. As a result, the Court finds that it is unlikely Graham's testimony on the value of Plaintiffs' loss of intimacy will "assist the trier of fact in arriving at the truth." *Mannino*, 650 F.2d at 851. The Court will exclude Graham's opinion on damages related to the loss of intimacy between Plaintiffs.

Based on the discussion above, Defendants' Motion to Exclude Graham [DE 68] is **GRANTED IN PART and DENIED IN PART** consistent with the Court's holdings.

**E. Defendants' Motion and Memorandum to Exclude Certain Opinions and Testimony of Paul J. Michaels, M.D. [DE 69]**

Plaintiffs disclosed Michaels as their general and case-specific causation pathology expert. [DE 82 at 4317].  Defendants moved to exclude Michaels arguing (1) the Court should not adopt the MDL Court's ruling, (2) Michaels' degradation opinions are unreliable, (3) Michaels' contraction, shrinkage, and deformation opinions are unreliable, (4) Michaels' opinions regarding complications are unreliable, (5) the Court should exclude Michaels' opinions on alternative designs, (6) the Court should exclude Michaels' summary of Defendants' documents and opinions on Defendants knowledge, state of mind, and corporate conduct, and (7) the Court should exclude Michaels' specific causation opinions.  [DE 69]  In response, Plaintiffs contend that the judicial estoppel doctrine prohibits Defendants from challenging Michaels' qualifications and refute all of Defendants' arguments.  [DE 82].

*1.  The MDL Case and Judicial Estoppel*

Defendants argue that the Court should not adopt the MDL Court's *Daubert* ruling on Michaels because the MDL Court did not substantively analyze their arguments and the ruling was not entered in this case.  [DE 69 at 2231].  In response, Plaintiffs contend that the MDL Court's order was entered.  [DE 82 at 4319].

The MDL Court addressed *Daubert* motions that asserted many of Defendants' same arguments to exclude Michaels.  *See In re Ethicon, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, MDL No. 2327, 2017 U.S. Dist. LEXIS 47988 (S.D. W. Va. Mar. 29, 2017).  The MDL Court did not substantively address Defendants' arguments on reliability.  *See id.* at *13.  The Court simply held "that the remaining issues contained in Ethicon's Motion are better suited for cross-examination" and denied Defendants' motion to exclude Michaels.  *Id.*  Moreover, this holding only applied to Wave 2 cases before the MDL Court, which did not include this action.  *See id.* at *14.  Because

27

the MDL Court only provided limited analysis and because the MDL Court's ruling did not apply to this case, the Court will not adopt the MDL Court's ruling on Michaels.

Plaintiffs also contend that Defendants are estopped from challenging Michaels' qualifications because they failed to do so in *Tucker v. Ethicon, Inc.*, No. 4:20-CV-1543 RLW, 2021 WL 825921 (E.D. Mo. Mar. 4, 2021). [DE 82 at 4319]. Judicial estoppel prohibits parties from taking inconsistent positions in separate judicial proceedings. *See Hiles v. Lexington-Fayette Urb. Co. Govt.*, 358 S.W.3d 422, 434 (Ky. App. 2008). Yet there is no indication that Defendants' position in *Tucker* conflicts with their position here. Just as in *Tucker*, Defendants attack the reliability of Michaels' opinions, not his qualifications. [DE 69]. Therefore, the Court will not find that judicial estoppel applies to Defendants' motion.

### 2.   *Michaels' Opinions Regarding Degradation*

Defendants make several arguments related to the admissibility of Michaels' degradation opinions. [DE 69]. First, Defendants move to exclude Michaels' opinions that Prolene degrades *in vivo* and that the degradation causes complications because they are unreliable. [DE 69 at 2233–41]. In response, Plaintiffs contend that the MDL Court consistently denied Defendants' motions to exclude similar experts. [DE 82 at 4325].

Michaels is board certified by the American Board of Pathology in Anatomic Pathology, Clinical Pathology, and Cytopathology. [DE 69-1 at 2258]. His focus is on breast and gynecologic pathology, as well as cytopathology. [*Id.*]. Michaels also testified that he had experience analyzing explanted polypropylene mesh and how it degrades prior to being retrained as an expert. [DE 69-2 at 2289, 2298–99]. Despite these qualifications, Defendants argue that Michaels' experience as a pathologist is inadequate to express an opinion on the degradation of polypropylene mesh. [DE 69 at 2233].

The Court finds the MDL Court's *Daubert* ruling on Vladimir Iakovlev, M.D. ("Iakovlev") instructive.  *See Edwards*, 2014 WL 3361923, at *24–25.  Like Michaels, Iakovlev was a pathologist who opined that he found degraded polypropylene "bark" when examining the plaintiff's explant.  *See id.*  The Court found that Iakovlev's experience and training as a pathologist qualified him to opine on polypropylene degradation.  *See id.*  The MDL Court came to a similar conclusion in *Eghnayem* where Judge Goodwin held "throughout these MDLs, I have allowed numerous pathologists to testify about the properties of polypropylene mesh.  57 F. Supp. 3d at 712 (citing *Sanchez, et al. v. Boston Sci. Corp.*, No. 2:12–cv–05762, 2014 WL 4851989, at *19–20 (S.D. W. Va. Sept. 29, 2014); *In re C.R. Bard, Inc.*, 948 F. Supp. 2d 589, 621 (S.D. W. Va. 2013)).  Defendants have not cited a case requiring the Court to ignore the precedent set by the MDL Court for pathologists like Michaels.  Accordingly, the Court finds that Michaels is qualified to opine on polypropylene degradation.

Next, Defendants contend that Michaels' opinions about degradation are not the product of reliable testing.  [DE 69 at 2234].  In response, Plaintiffs argue that the MDL Court has already rejected similar reliability arguments based on testing.  [DE 82 at 4325].  Testing is important in assessing the reliability of an expert's opinion.  *See Brown v. Raymond Corp.*, 432 F.3d 640, 648 (6th Cir. 2005). But as the Court has already explained, testing is not required to satisfy a *Daubert* inquiry.  *Anderson*, 2008 WL 3849923, at *5. The district court has the discretion to decide that an expert's failure to test their theories goes "to the weight of his testimony . . . not to its admissibility."  *Clay*, 215 F.3d at 668.

Based on testimony from a polymer scientist, Defendants argue that Fourier transform infrared spectroscopy, scanning electron microscopy, gel permeation chromatography, and tensile strength testing is required to determine whether a polymer has degraded.  [DE 69 at 2234].  In

*Edwards*, the MDL Court addressed this same argument asserted against Iakovlev.  *See* 2014 WL 3361923, at *25.  The MDL Court held that "Iakovlev is a pathologist, not a materials scientist. He makes his determinations by processing and analyzing explants from the human body."  *Id.* The processes Iakovlev used to examine polypropylene explants were standard in pathology, not material science.  *See id.*  Michaels bases his opinions on peer-reviewed publications and Defendants' own internal documents.  [DE 69-1 at 2285–318].  He also relied on polarized light microscopy to identify foreign materials.  [*Id.* at 2263, 2283].  The Court finds that, like Iakovlev, Michaels relied on industry-standard testing for pathologists and peer-reviewed literature to support his opinions.  Accordingly, the Court will not exclude his opinions for failure to use tests that are not industry standards for pathologists.  *See Edwards*, 2014 WL 3361923, at *25.  The Court finds, however, that this topic is appropriate for cross-examination.

Apart from Defendants arguments on testing, they also contend that Michaels' analysis is insufficient to establish that Prolene becomes embrittled or loses mechanical properties.  [DE 69 at 2235].  In response, Plaintiffs contend that Michaels' opinion is reliable because it is based on his training, expertise, and review of peer-reviewed publications.  [DE 82 at 4326].  As the Court noted above, pathologists may testify regarding polypropylene mesh to the extent of their training and expertise as a pathologist.  *See Edwards*, 2014 WL 3361923, at *25.  Michaels specifies that he relied on peer-reviewed publications and documents from Defendants when developing his opinions.  [DE 69-1 at 2263].  Therefore, to the extent Michaels relied on these studies and documents, the Court will not find his opinions on degradation unreliable.

Defendants, next, argue that Michaels' degradation opinions based on "bark" studies should be excluded because they rest on unreliable methodology.  In response, Plaintiffs contend that the use of polarized light microscopy, the method used to identify bark, has been recognized

as the industry standard and applied in Defendants' own studies.  [DE 82 at 4328].  The Court observes that District Courts have been split on this issue.  The *Edwards* Court denied Defendants' motion to exclude Iakovlev's degradation testimony based on his observations of bark on the plaintiff's polypropylene mesh.  *See* 2014 WL 3361923, at *25.  The court discounted Defendants' motion to simply a disagreement between experts.  *See id.*

Six years after the MDL Court's decision in *Edwards*, the Eastern District of Kentucky granted Defendants' motion to exclude Iakovlev's testimony based on its unreliable methodology. *See Cutter v. Ethicon, Inc.*, No. CV 5:19-443-DCR, 2020 WL 2060342, at *6 (E.D. Ky. Apr. 29, 2020).  The court explained that "Iakovlev should have conducted and completed a control *in vitro* experiment to substantiate the methodology employed to obtain his conclusions about *in vivo* degradation of polypropylene-based mesh." *Id.*  Despite excluding Iakovlev's degradation opinion based on his observation of bark in his own experiments, Judge Reeves noted that "stain and light microscopy methodology [was] generally accepted in the scientific community." *Id.*  This opinion appears to be the dominant theory among courts that have addressed this issue.  *See Kaiser v. Johnson & Johnson*, No. 2:17-CV-114-PPS, 2018 WL 739871, at *1–3 (N.D. Ind. Feb. 7, 2018) (excluding Iakovlev's degradation bark theory based on his own experiments but noting that Ethicon did not contest Iakovlev's degradation testimony supported by scientific literature and their own corporate documents); *Salinero v. Johnson & Johnson*, No. 1:18-CV-23643-UU, 2019 WL 7753453 (S.D. Fla. Sept. 5, 2019) (excluding Iakovlev's own testing but finding his degradation opinions based on other sources reliable); *In re Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2016 WL 4582209, at *5 (reserving on Iakovlev's methodology but not ordering a "blanket exclusion" of degradation testimony).  Accordingly, the Court will likewise exclude

31

Michaels' opinions only to the extent he relies on Iakovlev's personal tests suggesting bark on polypropylene mesh.

Next, Defendants assert that Michaels' degradation opinions are unreliable because the literature on which he relies does not support his opinions. [DE 69 at 2238]. In response, Plaintiffs contend that the peer-reviewed literature supports Michaels' opinions. [DE 82 at 4329]. Defendants identify six articles that Michaels relies on in his report and argue that they do not support his opinions or that they are irrelevant and unsound. [DE 69 at 2238–40]. Plaintiffs rebut Defendants' arguments on all but one article: A. Clave, *et al.*, *Polypropylene as a Reinforcement in Pelvic Surgery in Not Inert: Comparative Analysis of 100 Explants*, 21 Int. Urogynecol. J. 261 (2010) ("Clave Study"). [DE 82 at 4329–30]. Defendants base their arguments on differences between the studies and this case. [DE 69 at 2238–40]. They highlight differences such as Prolene versus polypropylene or mesh implanted in pelvic floor versus those implanted in the eye or implanted to remedy hernias. [*Id.*]. However, this Court, *supra* Section II.C.1., and the MDL Court have held that studies on polypropylene can inform opinions on Prolene. *See Huskey v. Ethicon, Inc.*, 29 F. Supp. 3d at 703; *In re: Ethicon, Inc.*, 2016 WL 4958282, at *2. Similarly, Defendants have cited no case law holding that mesh implanted in locations other than the female pelvic floor cannot inform opinions on Prolift. [DE 69].

To the extent that Defendants contest Michaels' reliance on the Mary Study, the Court reincorporates its ruling from Section II.C.1. Differences between Michaels' opinions and the studies he relies on are topics ripe from cross-examination. Otherwise, Defendants' arguments go to the weight of Michaels' testimony rather than its admissibility. *See Clay*, 215 F.3d at 668. The Court will exclude Michaels' testimony to the extent he solely relied on the Clave Study.

Plaintiffs' failure to address Defendants' arguments leads to Court to accept Defendants' assertion that the Clave study does not support Michaels' opinion.

Defendants also contend that Michaels' testimony is unreliable to the extent it relies on Defendants' internal studies. [DE 69 at 2240]. Defendants cite deposition testimony from experts suggesting that the internal studies did not show degradation. [*Id.* at 2240–41]. In response, Plaintiffs cite a rebuttal report by the same expert indicating otherwise. [DE 82 at 4431]. Whether Defendants' internal study supports degradation opinions is debated between the experts. That said, disagreement between expert opinions is not grounds for exclusion under *Daubert*. *See Edwards*, 2014 WL 3361923, at *25. Accordingly, the Court will not exclude Michaels' opinions based on the reliability of Defendants' own studies.

Finally, Defendants argue that Michaels' opinion that degradation causes complications is unreliable. [DE 69 at 2241]. In response, Plaintiffs contend that Michaels' opinion is reliable based on his review as a pathologist. [DE 82 at 4333–34]. When forming his opinions Michaels relied on a variety of sources, including peer-reviewed publications cited in his report and his experience as a pathologist. [*Id.* at 4335]. The Court finds that this issue is likely one for cross-examination. *See Clay*, 215 F.3d at 668. That said, without additional detail, the Court will not rule on this issue. *See Sperberg*, 519 F.2d at 712.

### 3.  *Opinions Regarding Contraction, Shrinkage, and Deformation*

Defendants move to exclude Michaels' opinions on contraction, shrinkage, and deformation of Prolift because they are unreliable. [DE 69 at 2242]. They argue that Michaels did not provide support for his opinions and that he did not follow the standard methodology used by pathologists for determining how a specimen is oriented in the human body. [*Id.*] In response, Plaintiffs contend Michaels' opinions are reliable because they rely on several sources, including peer-reviewed literature and his own experience. [DE 82 at 4334].

33

Michaels testified that "[w]hen I form an opinion it's based on everything, it's not based on just one thing." [DE 69-2 at 2297]. His report relies on several peer-reviewed studies and his own experiences as a pathologist. [DE 69-1]. The MDL Court has held that this is enough to satisfy the *Daubert* inquiry. *See In re Ethicon Inc. Pelvic Repair Sys. Prod. Liab. Litig.*, 2016 WL 4582209, at *4. Accordingly, the Court will not exclude Michaels' opinions on contraction, shrinkage, and deformation to the extent he can support them.

### 4.   *Opinions Regarding Complications*

Defendants move to exclude Michaels' opinions on complications resulting from Prolift as unreliable. [DE 69 at 2243]. They make three specific arguments: (1) Michaels' analysis is unreliable because he failed to use a control group, (2) Michaels' opinion that Prolift caused inflammation resulting in pain is unreliable because it is not supported by other studies, and (3) Michaels' opinion that the presence of a nerve in scar tissue or its proximity to mesh is indicative of pain is unreliable because there was no control group. [*Id.* at 2243–45]. In response, Plaintiffs contend that courts have already rejected Defendants' arguments. [DE 82 at 4335].

In *Tucker*, Defendants objected to Michaels' opinions based on his failure to use a control. *See* 2021 WL 825921, at *3–4. The *Tucker* Court held that "Michaels' case-specific opinions appear to be grounded on his general opinions and his review of Plaintiff's medical history, tissue samples, and explanted pelvic mesh. These are sufficiently reliable for purposes of Daubert, even if [] Michaels did not use a control sample." *Id.* at *4. The Court ultimately held that rulings on another expert's opinions should not control and refused to exclude Michaels' opinions. *See id.*

As in *Tucker*, the Court finds that Michaels' report shows that he conducted a detailed review of medical records and tissue samples. [DE 69-1]. His opinions are based on his experience as a pathologist and an examination of tissue samples. [*Id.* at 2265–83]. Michaels also conducted an extensive review of the relevant peer-reviewed literature. [*Id.* 2259–63]. To the extent that

Defendants argue that the Hill study undermines Michaels' opinions, [DE 69 at 2245], this topic is ripe for cross-examination. Arguments like this go to the weight of Michaels' testimony and must be reserved for the trier of fact. *See Clay*, 215 F.3d at 668. Accordingly, the Court finds that Michaels' opinions on complications are reliable and will not be excluded on this basis. *See Tucker*, 2021 WL 825921, at *3–4.

### 5. *Opinions Regarding Alternative Designs*

Defendants move to exclude Michaels' opinions about safer alternative designs because they are unreliable and irrelevant. [DE 69]. Michaels' opinions on safer alternative designs are relevant to Plaintiffs' design defect claims. As explained below, *infra* Section III.C, the Court dismissed Plaintiffs' design defect claim. For the Court to admit evidence, it must be relevant to the claims alleged. *See* Fed. R. Evid. 401. Because the Court dismissed Plaintiffs' design defect claims, testimony about alternative designs is not relevant. *See id.* Therefore, the Court will exclude Michaels' testimony on alternative designs.

### 6. *Opinions Regarding Defendants' Knowledge, State of Mind, and Corporate Conduct and Corporate Documents*

Defendants move to exclude Michaels' opinions about Defendants' knowledge, state of mind, and corporate conduct and opinions parroting corporate documents. [DE 69 at 2248]. In response, Plaintiffs note that they have briefed this issue for other experts and rest on their arguments. [DE 82 at 4339]. The Court, likewise, has addressed this issue. *Supra* Sections II.B.1 & II.C.2. As a result, the Court incorporates its reasoning and analysis. Michaels will be precluded from testifying about Defendants' knowledge, state of mind, and corporate conduct. *See In re Ethicon, Inc., Pelvic Repair Sys. Prod. Liab. Litig.*, 2014 WL 186872, at *6. Michaels will also be prohibited from acting as a conduit for corporate information or providing historical commentary on Defendants. *See In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d at 192.

35

### 7. *Opinions Regarding Specific Causation*

First, Defendants move to exclude Michaels' case specific opinions on causation because they rely on is inadmissible general opinions  [DE 69 at 2249–52].  Plaintiffs contend that Michaels' case-specific opinions are admissible for the same reason his general opinions are admissible.  [*Id.* at 4340].  An expert's "failure to offer or rely upon a general causation opinion renders [a] specific causation opinion[] without foundation and therefore inadmissible."  *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d at 458.  The Court notes that it has held that most of Michaels' opinions are admissible.  Therefore, Michaels' case-specific opinions will be precluded to the extent they rely on sections of his general opinions also excluded by the Court.

Next, Defendants argue that Michaels fails to explain how his methodology establishes specific causation.  [DE 69 at 2249–52].  Plaintiffs contend that Michaels' report establishes specific causation because he explains his analysis of tissue samples surgically removed from Elizabeth and how he reached his conclusions.  [DE 82 at 4340].  Under Rule 702, an expert must " explain the methodologies and principles that support his opinion; he cannot simply assert a bottom line.  *See Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010).  Michaels' opinions must also demonstrate causation.  *See Peters v. AstraZeneca LP*, 224 F. App'x 503, 507 (7th Cir. 2007) ("[A] correlation alone is not evidence of causation.").

Michaels' case-specific report details his analysis of these 16 tissue samples.  [DE 69-10 at 2767–70].  Michaels' report explains that he used "standard histopathology techniques."  [*Id.* at 2769].  The report also explains what Michaels observed in the tissue samples, including "distorted and convoluted bindles of polypropylene mesh filaments."  [*Id.* at 2767].  Michaels noted the mesh appeared to be "folded and distorted," [*Id.* at 2768], and that he observed "many of the histological findings that have been described in association with transvaginal mesh grafts that also correlate

with [Elizabeth's] reported symptomology." [*Id.*].  Michaels then explains the different types of inflammation he observed and how they are associated with pain.  [*Id.* at 2768–70].

Michaels' case-specific report provides several citations to the tissue samples as he explains his methodology and findings.  [*Id.* at 2767–70].  He also cites to several peer-reviewed studies as he walks through his analysis.  [*Id.*].  Michaels explains the existence of inflammation in Elizabeth's samples from the mesh explant.  [*Id.* at 2768].  For example, he notes that he identified several areas of "vascular dilation and congestion . . . associated with the overall fibrotic tissue response."  [*Id.*].  He adds that such "areas of vascular congestion . . . are indicative of a localized and compartmentalized anatomic environment resulting from the compressed graft framework[.]" [*Id.*].  This leads to abnormalities with circulation.  [*Id.*].  Drawing on his expertise, Michaels also concluded that Elizabeth's "explanted vaginal mesh tissue clearly confirms evidence of [a] chronic inflammatory reaction, characterized by increased number of lymphocytes and macrophages within the tissue."  [*Id.* at 2769].

Based on the Court's review of Michaels' case-specific report, the Court finds that Michaels sufficiently explains the methodologies and principles behind his conclusions to satisfy Rule 702.  *See Metavante Corp.*, 619 F.3d at 761.  Michaels also does more than present a report on mere correlation.  Michaels walks thoroughly walks through his analysis and explains how Elizabeth's Prolift implant caused internal damage.  [DE at 69-10 at 2767–70].  He also explains the effects and symptoms that resulted from this internal damage.  [*Id.*].  Accordingly, the Court finds that Michaels' opinion demonstrates causation.  *See Peters*, 224 F. App'x at 507.

Finally, Defendants assert that Michaels fails to consider alternative causes of Elizabeth's injuries.  [DE 69 at 2249–52].  Plaintiffs argue that Michaels was not required to consider alternative causes of Elizabeth's injuries because Kentucky law employs the substantial factor test.

[DE 82 at 4340–41].  The Court notes that it conducted a similar analysis and rejected Defendants' motion to exclude Graham on this same basis.  *See supra* Section II.D.3.  As the Court explained a differential diagnosis is an accepted technique for identifying the cause of medical problems, but the expert must adequately rule out other causes of injury.  *See Pluck*, 640 F.3d at 678–80.  Under Kentucky law, the defendant's conduct only needs to be a "substantial factor in bringing about the harm."  *Gonzalez*, 581 S.W.3d at 533–34.

        Contrary to Defendants' arguments, Michaels examined ruled out alternative causes of Elizabeth's injuries:

> Of note, within the tissue I examined, no viral inclusions or pathogenic microorganisms are recognized.  The vessels are devoid of fibrin thrombi or features to suggest a primary vasculitis.  No overlying squamous or urothelial mucosa is seen in these sections.  No endometriosis us present.  Finally, no features of neoplasia or malignancy are identified.

[DE 69-10 at 2768].  Instead, Michaels explained that he "identified many of the histological findings that have been described in association with transvaginal mesh grafts and that also correlate with [Elizabeth's] symptomatology."  [*Id.*].  In reaching these conclusions, Michaels conducted a thorough examination of Elizabeth's tissue samples and her medical records.  [DE 69-10].  The MDL Court has found these methods to be a reliable means of discounting alternative causes.  *See, e.g.*, *Edwards*, 2014 WL 3361923, at *6.  Michaels was not required to provide an exhaustive explanation of alternative causes he discounted.  *See id.*  Therefore, Michaels' opinions would pass under the differential diagnosis test.  *See Pluck*, 640 F.3d at 678–80.  The Court finds that Michaels' case-specific opinion are reliable and based on accepted scientific principles and research.  *See Edwards*, 2014 WL 3361923, at *6.

        Based on the discussion above, Defendants' Motion to Exclude Michaels [DE 69] is **GRANTED IN PART and DENIED IN PART** consistent with the Court's holdings.

## III.    DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT [DE 65-1]

Defendants moved for summary judgment on all but Counts III, VII, and XVI.  [DE 65-1].

In response, Plaintiffs voluntarily withdrew Counts II, IV, X, XI, XII, XIII, XVII, and XVIII.  [DE

81].  The only remaining claims at issue include Count I (Negligence), Count V (Design Defect),

Count VI (Fraud), Count VIII (Constructive Fraud), Count IX (Negligent Misrepresentation),

Count XIV (Gross Negligence), and Count XV (Unjust Enrichment).   [DE 11 at 175–76].

Accordingly, the Court will address the remaining claims below.

### A.  Standard

Summary judgment is required when "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving

party bears the burden of specifying the basis for its motion and showing the lack of a genuine

issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the moving party

satisfies this burden, the nonmoving party must produce specific facts showing a material issue of

fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  Factual differences

are not considered material unless the differences are such that a reasonable jury could find for the

party contesting the summary judgment motion.  *Id.* at 252.

The Court must view the evidence and draw all reasonable inferences in a light most

favorable to the nonmoving party.  *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000).

But the nonmoving party must do more than show some "metaphysical doubt as to the material

facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead,

the nonmoving party must present specific facts showing that a genuine factual issue exists by

"citing to particular parts of materials in the record" or by "showing that the materials cited do not

establish the absence . . . of a genuine dispute[.]"  *Shreve v. Franklin Cty., Ohio*, 743 F.3d 126,

136 (6th Cir. 2014).  "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Liberty Lobby*, 477 U.S. at 252.

Rule 56(c)(1) requires that a "party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

The parties agree that the substantive law of the Commonwealth of Kentucky applies to this case.  [DE 65-1 at 825; DE 81 at 4053].

## B. Count I (Negligence) & Count XIV (Gross Negligence) Related to a Manufacturing Defect

Defendants moved to dismiss Counts I and XIV to the same extent they moved to dismiss Plaintiffs' claims for a manufacturing defect.  [DE 65-1 at 829].  This is possible because Kentucky law treats negligence-based and strict liability-based product liability claims the same.  *See, e.g.*, *Nichols v. Union Underwear Co., Inc.*, 602 S.W.2d 429, 433 (Ky. 1980) (distinction between negligence and strict liability is of "no practical significance so far as the standard of conduct required of the defendant"); *see also Snawder v. Cohen*, 749 F. Supp. 1473, 1476 (W.D. Ky. 1990) ("theories of negligence and strict liability in failure to warn cases have been deemed to be functional equivalents").  Nevertheless, "a plaintiff can advance both a strict-liability claim and a negligence claim against the manufacturer of a product for injury suffered by that product."  *Est. of DeMoss by & through DeMoss v. Eli Lilly & Co.*, 234 F. Supp. 3d 873, 881 (W.D. Ky. 2017).

In their response, Plaintiffs noted that Defendants have not individually addressed Counts I and XIV.  [DE 81 at 4054].  Therefore, Plaintiffs incorporated their arguments on the related

counts by reference. [*Id.*]. But Plaintiffs did not put forth any argument in support of Count II (Manufacturing Defect). [*Id.* at 4061]. They, instead, chose to voluntarily withdraw this claim. [*Id.*]. This means that Plaintiffs did not put forth argument supporting their claims for negligence or gross negligence based on based on a manufacturing defect. By not responding in any capacity, Plaintiffs failed to put forth any material issue of fact that would allow their claims to survive summary judgment. *See Liberty Lobby, Inc.*, 477 U.S. at 247–48. Therefore, the Court must dismiss Counts I and XIV to the extent that they were asserted based on a manufacturing defect. Defendants' Motion for Partial Summary Judgment [DE 65-1] is **GRANTED** as it relates to Counts I and XIV concerning manufacturing defect.

### C. Count I (Negligence), Count 5 (Design Defect), and Count XIV (Gross Negligence) Related to a Manufacturing Defect

Defendants moved to dismiss Counts I, V, and XIV because (1) Plaintiffs lack proof of a feasible alternative design that would have prevented Elizabeth's injuries and (2) Plaintiffs lack proof of a specific design flaw that caused Elizabeth's injury.[3] [DE 65-1 at 826]. In response, Plaintiffs contend that they have provided necessary evidence in the form of expert opinions from Garely and Graham. [DE 81 at 4054, 4059].

#### 1. *Proof of a Feasible Alternative Design*

Before the Court can address the evidence submitted in support of Plaintiffs' claims, the parties dispute the applicable standard for this design defect claim. Plaintiffs argue that "Kentucky law does not require evidence that an alternative design would have prevented injury to the plaintiff." [DE 81 at 4057–58]. They contend that the court in *Burton v. Ethicon Inc.*, No. CV 5:20-280-DCR, 2021 WL 1725514, at *2 (E.D. Ky. Apr. 30, 2021) incorrectly relied on motor

---

[3] Defendants have moved to dismiss Counts I and XIV to the same extent they moved to dismiss Count V. *See Nichols*, 602 S.W.2d at 433. Accordingly, the Court will consider these counts together.

vehicle defect cases, which do require proof of an alternative design. [*Id.* at 4058]. In response, Defendants argue that the *Burton* Court did not err. [DE 84 at 4789]. They also argue that an alternative design has been required in design defect cases in the Western District of Kentucky and by the Sixth Circuit. [*Id.* at 4790].

Plaintiffs have cited no case law suggesting that proof of a feasible alternative design is unnecessary when pursuing a design defect claim for a medical device. Plaintiffs, instead, attempt to distinguish the motor vehicle cases because they require analysis under the crashworthiness doctrine. [DE 81 at 4058]. But the Supreme Court of Kentucky held that requiring proof of a feasible alternative design was consistent with other federal decisions outside the crashworthiness doctrine. *See Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35, 42 (Ky. 2004). The Court then described three other design defect cases requiring proof of an alternative design outside the cases requiring a crashworthiness test. *See id.* (citing *Jones v. Hutchinson Mfg., Inc.*, 502 S.W.2d 66, 70–71 (Ky. 1973); *Ingersoll–Rand Co. v. Rice*, 775 S.W.2d 924, 929 (Ky. App. 1988); *Sand Hill Energy, Inc. v. Ford Motor Co.*, 83 S.W.3d 483, 507–507 (Ky. 2002) (J. Cooper dissent)). Moreover, the Sixth Circuit and this Court have held that Kentucky law requires proof of a feasible alternative design. *See, e.g.*, *Burgett v. Troy-Bilt LLC*, 579F. App'x 372, 378 (6th Cir. 2014); *Naiser v. Unilever U.S., Inc.*, 975 F. Supp. 2d 727, 745–46 (W.D. Ky. 2013). Therefore, the Court will apply the following standard, which requires proof of a feasible alternative design.

"Kentucky applies a risk-utility test in design defect cases." *Toyota Motor Corp.*, 136 S.W.3d at 42. The applicable test under Kentucky law is "whether an ordinarily prudent company being fully aware of the risk, would not have put the product on the market." *Id.* "Whether the claim is based in negligence or strict liability, the plaintiff in a design defect case must provide expert testimony 'setting forth competent evidence of some practicable, feasible, safer, alternative

design.'"  *Burton*, 2021 WL 1725514, at *2 (quoting *Est. of Bingham v. DaimlerChrysler Corp.*, 462 F. Supp. 2d 766, 773 (E.D. Ky. 2006)).  A plaintiff "must show something more than that it was theoretically probable that a different design would have been feasible."  *Brock v. Caterpillar, Inc.*, 94 F.3d 220, 224 (6th Cir. 1996).  "While plaintiffs are not required to produce a prototype of the alternative design, they must provide sufficiently detailed expert testimony to establish that a reasonable alternative design could have been practically adopted at the time of the sale."  *Burton*, 2021 WL 1725514, at *4 (citing *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 432–33 (6th Cir. 2007)).

To prove that a safer, feasible, alternative design existed, Plaintiffs point to two pieces of testimony from Garely.  [DE 81 at 4055–57]  The first relates to Prolift's defective design.  [*Id.*].  Garely discusses how the polypropylene material used in Prolift kits was known to "cause an intense and chronic foreign body reaction."  [*Id.* at 4055].  His opinion explains how the arms on the Prolift kit caused damage and were impossible to remove.  [*Id.* at 4056].  Yet Garely does not offer an alternative design in this section of his report.  *See Lambert v. G.A. Braun Int'l, Ltd.*, No. 3:14-CV-00390-JHM, 2016 WL 3406155, at *3 (W.D. Ky. June 17, 2016) ("Simply restating that the dryer was unsafe does not provide the requisite alternative design, feasibility, or potential prevention of injury components necessary for design defect claims.").

Next, Plaintiffs cite Section H of Garely's expert report, which is titled "Ethicon had at its disposal a number of safer feasible alternative designs that could have been utilized instead of the Prolift kits."  [*Id.* at 4057].  His opinion reads:

> Aside from the use of native tissue repairs, or non-surgical pelvic organ prolapse treatments like Kegel exercises and pessaries, there are several alternatives to the design of the Prolift kits that would have been safer and just as effective if not more effective. Some of these alternatives include, but are not limited to: elimination of the mesh arms; elimination of the armed, blind trocar implantation design; possible use of alternative materials, such as biologic materials or polyvinylidene fluoride (PVDF/Pronova), which Ethicon recognized as safer than polypropylene. Ethicon has developed and/or sold products that contain some or all of these safer design components and/or characteristics, leaving no question that it was feasible for Ethicon to develop a safer design.

[*Id.* (quoting DE 81-1 at 4148)].   Because different procedures are not considered alternative designs, the Court cannot consider native tissue repairs or non-surgical pelvic organ prolapse treatment.  *See Burton*, 2021 WL 1725514, at *2 (citing *Mullins v. Johnson & Johnson*, No. 20:12-cv-02952, 2017 WL 711766, at *2 (S.D. W. Va. Feb. 23, 2017)).  This leaves (1) elimination of the mesh arms, (2) elimination of the armed, blind trocar implantation design, and (3) use of alternative materials, such as biologic materials or polyvinylidene fluoride (PVDF/Pronova) as possible alternative designs.  [DE 81 at 4057].

Again, *Burton* is instructive.  In *Burton*, an expert opined that a safer alternative design would be "[a] POP repair utilizing a lighter weight, larger pore mesh which does not employ the use of polypropylene mesh arms and/or trocars."  2021 WL 1725514, at *2.  The Court held that this description failed to adequately describe an alternative design.  *See id.* at 4.  Like the expert in *Burton*, 2021 WL 1725514, at *2, Garely simply recommends removing the mesh arms and eliminating the blind trocar implementation while also using a mesh made from a different material [DE 81-1 at 4148].  While Garely need not point to a prototype, he must provide more detailed testimony to establish that a reasonable alternative design could have been implemented.  *See Johnson*, 484 F.3d at 432–33.  Garely's testimony fails to rise to this level of specificity or detail.

The Southern District of Ohio's opinion in *In re Davol, Inc.*, No. 2:18-cv-01509, 2020 WL 5223363 (S.D. Ohio Sept. 1, 2020) provides a point of reference.  In *Davol*, the plaintiff alleged

that a polypropylene mesh product suffered from a defective designed. *Id.* at *8. The manufacturer

moved for summary judgment, asserting that the plaintiff had not provided sufficient evidence of

a safer alternative design. *See id.* It contended that the plaintiff had only provided evidence of

devices of a different class or devices that were unavailable. *See id.* None of plaintiff's proposals

constituted a safer alternative design. *See id.*

The court held, under Utah law, that the plaintiff had successfully proposed an alternative

design. *See id.* at *11. The plaintiff's expert noted in her report: "I believe that a safer, feasible

alternative . . . would be a mesh product that had larger pores (to get effective porosity of at least

1 mm), more elasticity to the polymer, used a more appropriate resorbable polymer, and/or was

biologic in primary composition." *Id.* at *11. The plaintiff's expert also opined:

> An example of a product that approaches these criteria is Bard Soft, a non-absorbable, low density monofilament polypropylene mesh . . . . Bard also designed, developed and marketed a product that was fully biologic, XenMatrix® AB, 187 comprised solely of noncrosslinked porcine acellular dermal matrix bioprosthetic . . . . Alternative devices include coating of a lightweight polypropylene mesh (28g/m2) with a large pore size (3.8 mm) with a different resorbable polymer that would not result in an acidic environment from its degradation products, such as poliglecaprone, in the UltraPro device by Ethicon.

*Id.* Based on the expert's opinions, the court held that "[t]hese alternative designs clearly

contemplate the use of mesh and even the use of polypropylene mesh, as well as different

formulations of the resorbable coating that is alleged to be defective here." *Id.*

The expert opinion in *Duvol* stands in stark contrast to Garely's opinion here. Garely

provides conclusory statements that do not offer an alternative with the same degree of specificity

as the expert in *Duvol*. *See* 2020 WL 5223363, at *11. Plaintiffs failed to provide a sufficiently

detailed expert report that could establish that a safer alternative design could have been adopted

at the time of Elizabeth's surgery.[4]  *See Burton*, 2021 WL 1725514, at *4.  And courts have held that using biologic mesh constitutes a different device as opposed to an alternative design.  *See, e.g.*, *Barnes v. Medtronic, PLC*, No. 2:17-CV-14194, 2019 WL 1353880, at *2 (E.D. Mich. Mar. 26, 2019).

The Court finds that Plaintiffs have failed to "set[] forth competent evidence of some practicable, feasible, safer, alternative design."  *Est. of Bingham*, 462 F. Supp. 2d at 773.  The Court is unable to determine from the evidence presented that it was more than "theoretically probable that a different design would have been feasible."  *Brock*, 94 F.3d at 224.  Because Plaintiffs have failed to submit evidence of a feasible alternative design, the Court must dismiss their claims based on a design defect.  *See Toyota Motor Corp.*, 136 S.W.3d at 42.  The Court need not address Defendants' alternative grounds for dismissal since Plaintiffs failed to submit sufficient evidence of a feasible alternative design.  Plaintiffs have failed to present a material issue of fact for trial.  *See Liberty Lobby, Inc.*, 477 U.S. at 247–48.  Accordingly, Defendants' Motion for Partial Summary Judgment [DE 65-1] is **GRANTED** as it relates to Count V and Counts I and XIV concerning design defect.

### D.  Count VI (Fraud), Count VIII (Constructive Fraud), and Count IX (Negligent Misrepresentation)

Defendants moved to dismiss Counts VI, VIII, and IX arguing that Plaintiffs cannot establish that Elizabeth relied on any statements or information from Defendants in deciding to undergo surgery using Prolift.  [DE 65-1 at 830].  In response, Plaintiffs contend that Elizabeth's reliance on Defendants' misrepresentations or omissions results from Kotheimer's review and reliance on information provided by Defendants.  [DE 81 at 4066].

---

[4] Plaintiffs also point to documents Garely reviewed related to "T-Pro/Thunder as a safer alternative." [DE 81 at 4057 (quoting 81-1 at 4164)].  But Garely does not opine that these documents described a safer alternative.  Therefore, the Court cannot glean additional detail from this citation.

A claim for fraud under Kentucky law "requires proof of six elements: material misrepresentation by the defendant; falsehood; making of a statement known to be false; to induce action by the plaintiff; reliance by the plaintiff; and injury to the plaintiff." *Snowden v. City of Wilmore*, 412 S.W.3d 195, 209 n. 10 (Ky. Ct. App. 2013). Constructive fraud "arises from the breach of a legal duty which the law would pronounce fraudulent because of its tendency to deceive others, violate confidence, or injure public interest." *Garvin v. Ethicon, Inc.*, 616 F. Supp. 3d 658, 672 (W.D. Ky. 2022) (quoting *Kendrick v. Bailey Vault Co.*, 944 S.W.2d 147, 150 (Ky. Ct. App. 1997)). Kentucky has adopted the Third Restatement concerning the elements of negligent misrepresentation: "One engaged in the business of selling or otherwise distributing products who, in connection with the sale of a product, makes a fraudulent, negligent, or innocent misrepresentation of material fact concerning the product is subject to liability for harm to persons or property caused by the misrepresentation." *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 746 n.11 (Ky. 2011) (quoting Restatement (Third) of Torts § 9).

"Kentucky common law fraud, constructive fraud, and negligent misrepresentation claims all require that a defendant make some form of an affirmative material misrepresentation that is relied upon by a plaintiff." *Cutter v. Ethicon, Inc.*, No. CV 5:19-443-DCR, 2020 WL 109809, at *10 (E.D. Ky. Jan. 9, 2020), *aff'd in part, rev'd in part and remanded,* No. 20-6040, 2021 WL 3754245 (6th Cir. Aug. 25, 2021). The *Cutter* Court's holding is an accurate statement of the law. Reliance is an element of common law fraud in Kentucky. *See Snowden*, 412 S.W.3d at 209 n. 10. Kentucky Court have also expressed the need for a plaintiff's reliance when pleading claims for constructive fraud. *See, e.g.*, *Coomer v. Phelps*, 172 S.W.3d 389 (Ky. 2005) (analyzing reliance as part of constructive fraud claim); *Stanley v. Trover*, No. 2013-CA-000901-MR, 2016 WL 99790, at *18 (Ky. Ct. App. Jan. 8, 2016) (same). Finally, reliance is also a requirement to prevail

on a claim for negligent misrepresentation under Kentucky law.  *See, e.g.*, *Presnell Const. Managers, Inc. v. EH Const., LLC*, 134 S.W.3d 575, 580–81 (Ky. 2004); *Thomas v. Schneider*, No. 2009-CA-002132-MR, 2010 WL 3447662, at *3 (Ky. Ct. App. Sept. 3, 2010).

Defendants argue that Plaintiffs cannot satisfy the reliance element of their fraud claims, [DE 65-1 at 830], and that Plaintiffs' claims cannot succeed because Elizabeth did not rely on Defendants' misrepresentation when deciding to undergo surgery and receive Prolift.  [*Id.* at 831]. The parties do not dispute that Elizabeth consulted only Kotheimer [*Id.*] and performed no additional research on Prolift [*Id.* at 971] prior to receiving the surgery.  Elizabeth testified that she relied only on Kotheimer's recommendation in deciding to undergo surgery for the Prolift implant.  [DE 65-6 at 985 ("Q. You decided to have the surgery to implant the Prolift on the recommendation of Dr. Kotheimer? A. Kotheimer, yes. Q. Kotheimer. Was there any other reason other than Dr. Kotheimer's recommendation that you decided to have the surgery? A. No."). Defendants have submitted no evidence that Plaintiffs relied on any information other than Kotheimer's recommendation.  [DE 81].

Defendants attempt to remedy this problem by explaining that Kotheimer relied on misrepresentations and omissions from Defendants regarding the risks of Prolift.  [DE 81 at 4066]. In turn, Kotheimer relayed the risks to Elizabeth using the same information.  [*Id.*].  Yet this theory has been explicitly rejected.  *See, e.g.*, *Cutter*, 2020 WL 109809, at *10.  In *Cutter*, the Eastern District of Kentucky dismissed claims for fraud, constructive fraud, and negligent misrepresentation when the plaintiff that her decision to undergo surgery was based solely on the recommendations of her doctor.  *See id.*  Like *Cutter*, Defendants made no misrepresentations to Plaintiffs that resulted in her decision to use Prolift.  *See id.*

In support of their claims, Plaintiffs cite *Corder v. Ethicon, Inc.*, 473 F. Supp. 3d 749 (E.D. Ky. 2020), which allowed a plaintiff's fraud, constructive fraud, and negligent misrepresentation to survive summary judgment in similar litigation. [DE 4063]. However, *Corder* is distinguishable. In *Corder*, the defendants argued that the plaintiff's claims constituted "improper efforts to end run the learned-intermediary rule." *Id.* at 761. The defendants did not move for summary judgment based on the plaintiff's lack of reliance. *See id.* Although *Corder*, may have addressed similar claims, it bears little relevance because *Corder* did not address the legal arguments at issue in this case. Therefore, the Court will follow *Cutter* and find that Plaintiffs failed to show that Elizabeth relied on a material misrepresentation from Defendants. *See* 2020 WL 109809, at *10. Plaintiffs have failed to present a material issue of fact for trial. *See Liberty Lobby, Inc.*, 477 U.S. at 247–48. Defendants' Motion for Partial Summary Judgment [DE 65-1] is **GRANTED** as it relates to Counts VI, VIII, and IX.

### E.  Count XV (Unjust Enrichment)

Defendants moved to dismiss Count XV because Plaintiffs cannot establish privity between Plaintiffs and Defendants. [DE 65-1 at 834]. In response, Plaintiffs contend that there is a genuine issue of material fact regarding the privity between Plaintiffs and Defendants. [DE 81 at 4068].

"For a party to prevail under the theory of unjust enrichment, they must prove three elements: (1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value." *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009). "Kentucky courts have consistently found that the first element not only requires a benefit be conferred upon the defendant, but also that the plaintiff be the party conferring that benefit." *Pixler v. Huff*, No. 3:11-CV-00207-JHM, 2011 WL 5597327, at *11 (W.D. Ky. Nov. 17, 2011) (collecting cases).

Plaintiffs paid Plaintiffs paid Baptist $1,786.67 for the Prolift kit.  [DE 81-1 at 4315].
Defendants cite *Gearhart v. Express Scripts, Inc.*, 422 F. Supp. 3d 1217 (E.D. Ky. 2019) to support
their argument for dismissal.  [DE 65-1].  In *Gearhart*, the defendant moved for summary judgment
on the plaintiff's claim for unjust enrichment because the plaintiff did not directly confer a benefit
on the defendant.  *See* 422 F. Supp. 3d at 1226–27.  The plaintiff had paid a fee to a third-party for
services who then paid then paid the defendant.  *See id.*  The court held that the plaintiff was too
far removed from the transaction because no benefit was directly conferred on the defendant.  *See
id.*  This case presents a similar situation.  Plaintiffs paid Baptist for the Prolift kit, not Defendants.
[DE 81-1 at 4315].

Plaintiffs correctly note that it is Defendants' burden to show that a fact cannot be
genuinely disputed by citations to the record.  [DE 81 at 4068].  But Defendants have cited
Plaintiffs' own highlighted exhibit that indicates Plaintiffs paid Baptist for the Prolift kit.  [DE 84
at 4796 (citing DE 81-1 at 4315)].  As a result, Plaintiffs have failed to present a material issue of
fact for trial on their claim for unjust enrichment.  *See Liberty Lobby, Inc.*, 477 U.S. at 247–48.
Defendants' Motion for Partial Summary Judgment [DE 65-1] is **GRANTED** as it relates to Count
XV.

## IV.    CONCLUSION

Having thus considered the parties' filings and the applicable law, and being otherwise
sufficiently advised, the Court **ORDERS** that:

1.     Defendants' Motion to Exclude Garely [DE 66] is **GRANTED IN PART and
DENIED IN PART** consistent with the Court's holdings;

2.     Defendants' Motion to Exclude Mays [DE 67] is **GRANTED IN PART and
DENIED IN PART** consistent with the Court's holdings;

3.      Defendants' Motion to Exclude Graham [DE 68] is **GRANTED IN PART and DENIED IN PART** consistent with the Court's holdings;

4.      Defendants' Motion to Exclude Michaels [DE 69] is **GRANTED IN PART and DENIED IN PART** consistent with the Court's holdings;

5.      Defendants' Motion for Partial Summary Judgment [DE 65-1] is **GRANTED**; and

6.      The Parties' Joint Motion for Status Conference [DE 100] is **DENIED**.

September 14, 2023

Rebecca Grady Jennings, District Judge
United States District Court

cc:      Counsel of record